Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| J.S. and A.S.,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED HEALTHCARE INSURANCE COMPANY, UNITED BEHAVIORAL HEALTH, and the MAERSK INC. WELFARE BENEFITS PLAN.<br><br>Defendants. | COMPLAINT<br><br>Case No. 2:22-cv-00075-JNP |

Plaintiffs, J.S. and A.S., through their undersigned counsel, complain and allege against Defendants United Healthcare Insurance Company ("UHC"), United Behavioral Health ("UBH") (collectively "United") and the MAERSK Inc. Welfare Benefit Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. J.S. and A.S. are natural persons residing in Mecklenburg County, North Carolina. J.S. is A.S.'s father.

1

2. United is an insurance company headquartered in Hennepin County, Minnesota and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. UHC administers and is otherwise responsible for medical and surgical claims under the Plan. UBH administers and is otherwise responsible for mental health claims under the Plan.

4. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). J.S. was a participant in the Plan and A.S. was a beneficiary of the Plan at all relevant times. J.S. and A.S. continue to be participants and beneficiaries of the Plan.

5. A.S. received medical care and treatment at Chrysalis School Montana ("Chrysalis") from February 8, 2019, to March 11, 2020. Chrysalis is a treatment facility located in Lincoln County, Montana which provides sub-acute inpatient treatment to adolescent girls with mental health, behavioral, and/or substance abuse problems.

6. United denied claims for payment of A.S.'s medical expenses in connection with her treatment at Chrysalis.

7. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

8. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, and because United has significant business operations in Utah. In addition, venue in Utah will save the Plaintiffs costs in litigating this case. Finally, in light of the sensitive nature of the medical

treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

9. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### A.S.'s Developmental History and Medical Background

10. When she was in middle school A.S. was discovered to be self-harming by cutting. This happened around the time that one of A.S.'s childhood friends no longer wanted to associate with her and A.S. started to isolate herself and hide in her room.

11. A.S. stated that she was severely depressed and began to meet with a psychologist. Despite this, she continued to cut herself and threaten suicide. A.S. started to refuse to attend school and on one occasion she held a kitchen knife to her throat and threatened to kill herself after her phone was taken away. The paramedics were called and A.S. was taken to the psychiatric hospital.

12. After she was released, A.S. tried to punch her father and was readmitted to the hospital. A.S. was then taken to an outdoor behavioral health program called Trails via a crisis transportation company. A.S.'s treatment team recommended that she be placed in a "structured therapeutic residential setting" following her discharge from Trails and she was admitted to Chrysalis.

## The Appeals Process

13. A.S. was admitted to Chrysalis on February 8, 2019.

14. In a letter dated July 30, 2019, United denied payment for A.S.'s treatment for dates of service October 1, 2019 through March 11, 2020.[1] The letter stated in pertinent part:

    > You were admitted for treatment of your Mood disorder. You were free of harm to yourselves [sic] or others. Your care could have continued in the Partial Hospitalization Program Setting with individual psychotherapy, family therapy and medication management. A care advocate is available to discuss treatment options and community supports that are available in your area.
    >
    > Based on our Level of Care Guideline for the Mental Health Residential Treatment Services Level of Care, it is my determination that no authorization can be provided from 02/08/2019 to 05/31/2019 for one hundred twelve (112) units/days.
    >
    > This decision was based on Optum Level of Care Guidelines clinical guidelines.

15. On January 14, 2020, J.S. submitted a level one appeal of the denial of A.S.'s treatment. J.S. argued that he was entitled to various protections under ERISA including a full, fair, and thorough review which took into account all of the information he provided, used appropriately qualified reviewers and disclosed their identities, provided him with the specific reasoning for the determination, and provided him with the information he required to perfect the claim. J.S. also noted that United had listed the incorrect dates of service in its denial.

16. J.S. wrote that A.S. was admitted to Chrysalis on the clear recommendations of her entire treatment team. J.S. contended that United's denial violated generally accepted standards of medical practice with its requirements such as "You were free of harm to yourself or others."

---

[1] These dates come from the heading. The body of the letter quoted below lists different dates of service.

4

17. J.S. referenced a court decision in *Wit, et.al., v. United Behavioral Health* in which the court found the guidelines utilized by United violated generally accepted standards of medical practice on multiple counts including emphasizing acuity and crisis stabilization over effective treatment of the patient's condition, failing to address co-occurring conditions, pushing patients into a lower level of care even if it was less likely to be effective, failing to address the unique needs of children and adolescents, and using a list of mandatory prerequisites to evaluate the medical necessity of treatment.

18. J.S. stated that *Wit* specifically referenced United's guidelines which were in effect between 2011 and 2017, but it was clear from the language United used in its denial letters that when it denied payment for A.S.'s treatment it continued to rely on factors which the court had found to be problematic in *Wit*.

19. J.S. stated that a requirement of harm to self or others was not appropriate for the residential treatment center level of care and individuals exhibiting these symptoms required inpatient hospitalization. He argued that imposing a requirement of harm to self or others for residential treatment was a violation of generally accepted standards of medical practice.

20. J.S. argued that United's criteria remained problematic in other ways as well, such as its use of the same criteria to evaluate the treatment of both adults and adolescents. He asked United to reevaluate the claim using the Plan's definition of medical necessity rather than proprietary criteria.

21. J.S. wrote that it was clear A.S. met the Plan's requirements for residential treatment at Chrysalis. J.S. requested that United perform a parity analysis of the Plan to ensure it was compliant with MHPAEA and asked to be provided with the specific reasons for the

determination along with any corresponding evidence, a copy of any administrative service agreements that existed, the Plan's clinical guidelines or medical necessity criteria for mental health, substance use, skilled nursing, inpatient rehabilitation, and hospice, as well as any reports or opinions from any physician or other professional regarding the claim. (collectively the "Plan Documents")

22. In a letter dated May 7, 2020, United again denied payment for A.S.'s treatment. This time for dates of service from February 8, 2019 through September 30, 2019. The letter was attributed to Sonya Jones, MD and gave the following justification for the denial:

    Your child was receiving treatment for mood problems.

    Using the Optum Level of Care Guidelines, we reviewed a request to begin benefit coverage for the Mental Health Residential Treatment Level of Care as of 02/08/2019.

    After reviewing the records, it is noted that your child's condition did not meet the Optum Level of Care Guidelines for coverage of treatment in this setting.

    She was stable from a medical and mental health standpoint. She was staying safe. She was tolerating her medication. She was able to take care of her needs. She had family support. She did not require 24-hour care. In addition, treatment at this facility does not appear to have been at the level of intensity that is expected at this level of care.

    Care and recovery could have continued in the Mental Health Partial Hospitalization Program setting.

23. In addition, United sent the Plaintiffs a letter dated May 22, 2020, which denied payment for dates of service from October 1, 2019 forward. This letter was again signed by Sonya Jones and gave essentially the same justification for the denial except past tense statements such as "She was stable" were altered to be present tense statements such as "She is stable." No indication is given as to why these statements were altered or by whom.

6

24. The letter also no longer stated that it was an urgent appeal request even though it is clearly the same review as the urgent May 7, 2020 letter with some of the dates and language altered.

25. On June 5, 2020, J.S. submitted a level two appeal of the denial of A.S.'s treatment. J.S. contended that United had committed a series of errors in its review of A.S.'s claims and that it had not abided by its responsibilities as outlined by the insurance contract.

26. J.S. quoted language from the initial Sonya Jones denial letter which stated, "As requested, I have completed an urgent appeal/grievance review on 05/05/2020 03:04 PM CDT on a request we received on 01/17/2020."

27. J.S. pointed out that not only had United waited nearly four months after it received the appeal to process it, in direct violation of the Plan document which guaranteed a response within thirty days, but the appeal had been processed as an urgent appeal request when he had not asked for an urgent review to be performed.

28. J.S. also noted that United had listed the incorrect dates of service in both of its Sonya Jones denials and asked it to consider all dates of service as he had initially requested in his first appeal.

29. He questioned how he was supposed to have any confidence that United had properly reviewed his appeal when it committed such basic mistakes, especially given that when United did finally issue a denial, it was filled with "vague and generic language that could easily apply to any patient requesting residential benefits."

30. J.S. wrote that United appeared to have ignored the arguments he raised in his level one appeal. He again contended that United was engaging in the same practices the *Wit* court had found to be impermissible. He also pointed out that after its loss in *Wit*, United

abandoned the guidelines it was using to evaluate A.S.'s treatment. He again asked the reviewer to rely on the Plan's definition of medical necessity rather than on guidelines which had now been retired.

31. J.S. argued that A.S.'s treatment was medically necessary as evidenced by her history and medical records. J.S. included updated medical records with the appeal and argued that previous treatment interventions had been ineffective. He stated that Chrysalis was a licensed residential treatment facility and had been effective at treating A.S.

32. J.S. expressed concern at United's lack of consistency in its denial rationale. He stated that in communications with his employer United had largely implied that claims were denied for a lack of prior authorization, although United had never communicated any such denial rationale to him. J.S. stated he felt United was "throwing everything at the wall and seeing what sticks" instead of coming up with a genuine justification for the denial.

33. J.S. wrote that United had initially approved many of A.S.'s claims while denying others and had then gone back and reversed claims which it had previously approved. J.S. accused United of acting arbitrarily and wrote that its erratic behavior had made the process more difficult than it should have been. J.S. again requested to be provided with a copy of the Plan Documents.

34. In a letter dated July 10, 2020, United again denied payment for A.S.'s treatment. The letter once more did not list the dates of treatment correctly, this time listing dates of service from October 1, 2019 through March 1, 2020. The letter gave the following explanation for the denial:

> We've denied the medical services/items listed below requested by you or your provider: Mental Health Residential Treatment as of October 1, 2019.[2]
>
> You were being treated for problems with your mood and behaviors. Your request was reviewed by a doctor. You were taking your medications and participating in treatment. Your symptoms had improved. We have denied the medical services requested after reviewing your medical records and clinical notes.
>
> The criteria were not met because you did not need the care provided in Residential Treatment Center setting. You could have been treated in a less intensive Level of Care.
>
> In your case, you were cooperative for treatment [sic] and participating in programming. You were not feeling like harming yourself or others. You were taking your medications and doing better. You were able to learn and use coping skills. You had a more stable mood. You were not acting on every impulse. You did not have clinical issues requiring 24 hour monitoring in a residential setting. You had no mental health issues that prevented treatment in a less intensive setting. You had a safe place to live and the support of family.
>
> Care and recovery could have continued in the Mental Health Partial Hospitalization (PHP) setting. Children and adolescents usually live at home during PHP. Please discuss these options with your provider.

35. On August 20, 2020, J.S. submitted an additional level two appeal of the denial. J.S. wrote that despite the fact that he had corrected United several times, it continued to utilize the incorrect dates of service. He stated that United's refusal to correct this simple error made him concerned that United was either acting maliciously or had reviewed his appeals on a very superficial level, if at all. J.S. listed the correct dates of service as February 8, 2019, through March 11, 2020.

36. J.S. wrote that he had received two letters in response to his level one appeal, both signed by Sonya Jones. He pointed out that the letters were largely identical except they each

---

[2] A.S. was admitted to Chrysalis on February 8, 2019. This letter states that the reviewer found A.S.'s residential treatment to be not medically necessary as of October 1, 2019. It is unclear whether this means the reviewer felt the eight prior months were medically necessary and should have been approved, or whether the reviewer only looked at a small subset of the dates of service despite the fact that J.S. asked for A.S.'s entire treatment to be evaluated. If United did intend to approve the first eight months of treatment, it did not provide any payment to the Plaintiff.

listed different dates of service, both of which he pointed out were incorrect, and they each contained contradictory information about his remaining appeal rights.

37. J.S. argued that if United could not be bothered to ensure its own denial letters contained accurate information, he had no confidence that it had given him the full, fair, and thorough review it was required to provide under ERISA, especially when it failed to so much as acknowledge any of the issues he raised. J.S. again requested to be provided with a copy of the Plan Documents.

38. In a letter dated August 31, 2020, United upheld the denial of payment stating that A.S.'s "condition did not meet the guideline for coverage of treatment in this setting." As with each and every denial letter provided to the Plaintiffs, it listed the incorrect dates of service. This particular letter denied dates of service between February 16, 2019 and September 30, 2019.

39. The letter also stated that "I have completed an appeal/grievance review on a request we received 01/17/2020," meaning United not only waited more than seven months to conduct this particular review, but also that this letter was a response to J.S.'s initial appeal even though United had already ostensibly reviewed these dates in its initial Sonya Jones letter.

40. J.S. then submitted an undated complaint to the Plan Administrator which detailed the administrative errors United had committed and stated that it had yet to respond to his level two appeal. As of the filing of this complaint United has not responded to J.S.'s latest appeal or taken any action to correct the errors J.S. identified.

41. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

42. The denial of benefits for A.S.'s treatment was a breach of contract and caused J.S. to incur medical expenses that should have been paid by the Plan in an amount totaling over $155,000.

43. United failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of J.S.'s repeated requests.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

44. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

45. United and the Plan failed to provide coverage for A.S.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

46. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

47. The denial letters produced by United do little to elucidate whether United conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. United failed to substantively respond to the

issues presented in J.S.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

48. J.S. pointed out that United repeatedly and consistently committed errors such as listing the incorrect dates of service. J.S. asserted it was clear he had not been provided with the full, fair, and thorough review to which he was entitled under ERISA.

49. J.S. complied with all of his appeal obligations as outlined in the insurance policy. However, despite the summary plan description stating that regarding post-service appeals "UnitedHealthcare must notify you" of the appeal decision within thirty days[3], United missed this deadline on more than one occasion by several months.

50. United's last denial letter was so late that J.S. had submitted two separate additional appeals in the meantime. United's last denial letter also responded to a level one appeal to which United had already denied months earlier.

51. United and the agents of the Plan breached their fiduciary duties to A.S. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in A.S.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of A.S.'s claims.

52. The actions of United and the Plan in failing to provide coverage for A.S.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

---

[3] United unilaterally conducted one of its appeals as an urgent request for benefits. The Plan states that in the event an urgent appeal review is conducted, the review must be completed within 72 hours.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

53. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of United's fiduciary duties.

54. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

55. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

56. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

57. The medical necessity criteria used by United for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical

necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

58. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for A.S.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

59. For none of these types of treatment does United exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

60. When United and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

61. United and the Plan evaluated A.S.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

62. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, United's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that A.S. received. United's improper use of acute inpatient medical necessity criteria is revealed in the statements in United's denial letters such as "You were free of harm to yourselves [sic] or others."

63. J.S. specifically argued that it was contrary to generally accepted standards of medical practice to place an individual in residential treatment if they posed a risk of harm to self or others. He stated that when this was the case inpatient hospitalization was the proper remedy.

64. When United evaluates the medical necessity of intermediate level medical or surgical treatment it does not rely on factors such as danger to self or others and instead either approves or denies care based on generally accepted standards of medical practice.

65. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that A.S. received.

66. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria as a condition to receiving Plan benefits.

67. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

68. The Defendant cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice.

69. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

70. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and United, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

71. United and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that United and the Plan were not in compliance with MHPAEA.

72. The violations of MHPAEA by United and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

    (a) A declaration that the actions of the Defendants violate MHPAEA;

    (b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

    (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

    (d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

    (e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

    (f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for his loss;

    (g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

    (h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

73. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for A.S.'s medically necessary treatment at Chrysalis under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 8th day of February, 2022.

                                                 By    s/ Brian S. King
                                                        Brian S. King
                                                        Attorney for Plaintiff

County of Plaintiffs' Residence:
Mecklenburg County, North Carolina.